NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0756n.06

No. 08-6046

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| DONALD ALDRIDGE, NORMA JULIE BARROW, CLAUDETTE BOYD, WALTER CARVER, KENNETH CONNATSER, CHARLES FREEMAN, JAMES HOLLAND, JAMES HOLMES, RICKY HUTCHESON, LARRY JACKSON, JAMES JONES, JR., ERNEST LANCASTER, RICHARD MILLEN, BERTHA NELSON, DAVID O'BRYAN, GEORGE OLIVE, CHAM PAYNE, ALAN PENDLETON, WILLIAM PHILLIPS, WILLIAM PORTER, DAVID ROBERTSON, ROBERT STONE, ROY THOMAS, LENNEL TORRANCE, MIKE WAGNER, and TOMMY WOODS, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |  |
|     Plaintiffs-Appellants, | ) ) |  |
| v. | ) ) | On Appeal from the United States District Court for the Western District of Tennessee |
| CITY OF MEMPHIS and LARRY GODWIN in his individual capacity, | ) ) ) |  |
|     Defendants-Appellees. | ) ) ) |  |

**FILED**
**Dec 14, 2010**
LEONARD GREEN, Clerk

Before: BOGGS, MOORE, and GIBSON, Circuit Judges.[*]

**BOGGS, Circuit Judge.** Plaintiffs, 26 former captains in the Memphis Police Department ("Department"), appeal from the district court's grant of summary judgment. This action arose when the Department abolished the rank of captain and, without a hearing, demoted all then-captains to their former ranks. A subset of the demoted captains filed suit against the City of Memphis ("City")

_____

[*] The Honorable John R. Gibson, United States Circuit Judge for the Eighth Circuit, sitting by designation.

No. 08-6046
*Aldridge, et al. v. City of Memphis, et al.*

and the Department's Director, Mike Godwin ("Godwin"), alleging breach of contract and violations

of the Due Process Clause, Equal Protection Clause, Title VII of the Civil Rights Act of 1964 ("Title

VII"), 42 U.S.C. § 1981, the Age Discrimination in Employment Act ("ADEA"), and the Tennessee

Human Rights Act ("THRA"); against Godwin, plaintiffs also alleged tortious interference with their

employment relationship. The district court granted summary judgment for the defendants on all

claims. Reviewing de novo, *see Petty v. County of Franklin, Ohio*, 478 F.3d 341, 345 (6th Cir.

2007), we affirm.

## BACKGROUND

The genesis of this dispute occurred in 1927, when a section was inserted into the City's

charter ("Charter") providing:

> Automatic Promotion to captain after thirty years.
>
> Any fireman or policeman, who shall have served the City of Memphis for a period of thirty (30) years, either continuously or intermittently, shall, at the expiration of said thirty years, automatically be promoted to the rank of captain of the fire division or captain of the police division, with all the salary, emoluments and other privileges of said rank; and, upon the retirement of such fireman or policeman, he shall receive a pension as captain.

City Charter § 67 (Priv. Acts 1927, Ch. 521; Ord. No. 2725, § 1, 5-23-78) ("§ 67").[1] For much of

the Department's modern history, captain was the second-highest civil-service rank in its hierarchy.

The only rank above captain was inspector; below captain, in descending order, came the ranks of

lieutenant, sergeant, and finally, patrol officer. Generally, officers were promoted through the ranks

---

[1] In 1978, additional language was added to the Charter eliminating automatic promotion for employees hired after January 31, 1979. As plaintiffs were all hired before that date, the Charter amendment has no effect on them.

one step at a time on the basis of competitive testing. Under § 67, however, any officer completing 30 years of service was immediately promoted to captain, regardless of how far he or she had progressed through the ranks and regardless of the skills he or she had attained. Consequently, some captains held that rank on the basis of testing ("merit captains"), while others held that rank solely on the basis of length of service ("tenure captains").

It is undisputed that, in prior years, the Department has had legal difficulties with respect to the hiring of African-Americans and women. Until 1948, the Department did not hire a single African-American officer. In 1974, the United States sued the City, alleging that the Department utilized discriminatory hiring and promotional tests; the City admitted in a binding stipulation that historically, minorities had "been excluded from or limited in hiring and promotional opportunities within its police department." Consequently, the City entered into a consent decree to remedy the underrepresentation of African-Americans and females in the Department's ranks. The first African-American officer did not achieve 30 years' tenure and promotion to captain under § 67 until 1981, and the first female, until 1988.

In 1991, the Department gave merit captains the new title of "major" to distinguish them from tenure captains, leaving only the latter with the title "captain." After this redesignation, captain and major were considered parallel ranks in the Department's hierarchy, both above lieutenant but below inspector. Both captains and majors received the same salary and pension benefits. Both were eligible to compete for merit-based promotion to inspector.

In 2004, the first of the cohort of black and female officers hired under the 1974 consent decree completed thirty years of service. Consequently, the number of black and female captains climbed rapidly.

In August of that year, Godwin, a white male and long-time officer with the Department, became its new Director. As one of his first tasks, Godwin instructed Deputy Chief Jim Tusant to examine how the tenure-based captain rank squared with the Department's organizational needs. Tusant determined that, although captains were paid the same salary as majors, the majority of captains were performing tasks typical of lower-ranked (and lower-paid) officers, including lieutenants, sergeants, and even patrol officers, the entry-level rank.[2] Based on this, Godwin concluded that the captain rank was inefficient and "operationally unnecessary." Although no formal budgetary analysis was conducted, Godwin estimated that eliminating the rank of captain and reverting captains to the ranks they had held before their automatic promotion would save the Department approximately $1.4 million.[3]

On February 18, 2005, Godwin assembled the captains and told them, "[T]he city's in the midst of a serious financial situation. In order for the city to have funds to meet payroll and its obligations, spending must be significantly reduced." He then announced that the captain rank would be eliminated. Then-captains were given the choice to retire or revert to their rank and salary

---

[2]  There is no dispute, however, that the captains were all performing those duties satisfactorily.

[3]  The annual salary differential between captains and lieutenants was $8,046.27; between captains and sergeants, $12,907.65; and between captain and patrol officers, $17,802.93.

prior to their automatic promotion. Those who chose to stay on in their former rank would be eligible to participate in the next promotional process alongside the other employees of that rank. Regardless of his or her choice, upon retirement – at that time, or in the future – each then-captain would receive all pension benefits to which captains had been theretofore entitled.

None of the captains had an express written or oral employment contract. Before the rank was abolished, the Department had never terminated, demoted or suspended a captain without just cause or expressly informed captains that they could be terminated, demoted or suspended without cause. However, in 1988, the City had eliminated the tenured captain rank in the Memphis *Fire* Department (which had also been governed by § 67) and terminated all but one of the employees holding that rank.

Days after the captain rank was abolished, the Department temporarily promoted approximately 52 sergeants to "acting lieutenant." The Department had already been short 50-60 lieutenants prior to these events. None of those appointed acting lieutenants were newly demoted ex-captains. In June 2005, the acting lieutenant assignments were rescinded; the Department then permanently promoted 120 sergeants to lieutenant and 49 lieutenants to major. This round of promotions had been planned independently of, and prior to, the decision to eliminate the captain rank, as the department had a serious shortage of lieutenants and majors.[4]

---

[4] The parties do not address whether any of those permanently promoted in June 2005 to lieutenant or major were ex-captains. Plaintiffs do not assert a separate "failure to promote" claim based on these subsequent actions.

Notwithstanding Godwin's statements at the February 18, 2005 meeting, the City's Chief Administrative Officer ("CAO") testified that in February 2005, the City was not in danger of failing to meet its payroll and that eliminating the rank of captain was not necessary to meet payroll. Additionally, Godwin testified at his deposition that the Department would have had a budget surplus even if the captain rank had not been abolished. However, the CAO did testify that the City had "organizational financial challenges" at the time, that the City needed to reduce spending to increase its reserve fund, and that "during that time period . . . all [City] divisions were asked to reduce their budget . . . ."

At the time of Godwin's announcement, the 93 captains had an average age of 56.52; of necessity, each was older than 40. By comparison, the average age of the majors – the most comparable group of officers in terms of salary and prestige – was 52.16 (or 4.36 years younger than the average captain). Plaintiffs' own statistical expert testified that the majors "were basically the same age distribution as [the] captains" and that, though "[t]hey were slightly younger, . . . there wouldn't have been a statistical difference."[5] Of all the Department's employees over age 40, 11.25% were impacted by the decision to abolish the rank of captain; by contrast, of the employees below age 40, none were impacted.

At the time the rank was abolished, a majority of the captains were Caucasian (59.1%, versus 40.9% African-American) and a supermajority were male (94.6%, versus 5.4% female). Of the 60

---

[5] While ranks other than major are less comparable to the captain rank, the average ages of the remaining civil-service ranks were: patrol officer, 36.23; sergeant, 42.39; lieutenant, 46.51, and inspector, 57.77.

black tenure captains in the Department's history, 45% had attained that rank in the nine months immediately before the rank was abolished. Meanwhile, 71% of the seven female tenure captains in the Department's history had attained that rank since 2002.

The record is devoid of evidence that Godwin or any other City or Department employee displayed explicit animus toward any protected class. However, there is evidence that Godwin made rude or derogatory remarks about individual captains and about the captain rank in general. On one occasion in 1998, he told a colleague, "[T]hose goddamn Captains need to die. They are ruining the police department. They need to go."[6] At other times, he remarked that captains were unable to "pour piss out of a boot," that captains were "worthless pieces of shit," and that there were not more than a "handful of captains" in the Department "worth a damn." At one captain's promotion ceremony, Godwin told a co-worker, "I don't know nothing about this woman, but she hung around here 30 years." While the record does not reflect the dates on which Godwin made most of these remarks, it is clear that at least two of them predate the 2004 spike in the number of African-American and female captains.

On December 27, 2005, 26 demoted captains filed suit against the City and Godwin. Sixteen of the plaintiffs are white males, seven are black males, two are black females and one is a white female. All 26 plaintiffs alleged (1) that the abolition of the captain rank without a pre-deprivation hearing violated the Due Process Clause; (2) that it lacked a rational basis and/or was motivated by

---

[6] Plaintiffs do not argue that Godwin's "Captains need to die" remark was an oblique reference to the captains' age. Nor, in this context, would such an assertion be plausible. Godwin himself was 53.37 years of age at the time – scarcely younger than the average captain.

"animus against captains" in violation of the Equal Protection Clause; (3) that it constituted disparate-treatment and disparate-impact discrimination on the basis of age in violation of the ADEA and THRA; (4) that it breached the City's employment contract with plaintiffs and its contractual duty of good faith and fair dealing; and (5) that Godwin had tortiously interfered with those contractual relationships. The African-American plaintiffs also argued (6) that the abolition constituted disparate-treatment race discrimination in violation of the Equal Protection Clause, Title VII, 42 U.S.C. § 1981, and the THRA; and the female plaintiffs argued (7) that it constituted disparate-treatment sex discrimination in violation of the Equal Protection Clause, Title VII, and the THRA.

In a series of orders culminating on August 13, 2008, the district court granted summary judgment in defendants' favor as to all claims and dismissed the action. Plaintiffs timely appealed.

## DISCUSSION

### I. Due Process

Plaintiffs argue that their demotion without a pre-deprivation hearing deprived them of a property interest without due process.

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the fourteenth amendment's protection of liberty and property." *Bd. of Regents v. Roth*, 408 U.S. 564, 569 (1972). "Such interests do not arise from the Constitution itself, but rather, 'are created and their dimensions . . . defined by existing rules or understandings that stem from an independent source . . . .'" *Woolsey v. Hunt*, 932 F.2d 555, 564 (6th Cir. 1991) (quoting *Roth*, 408 U.S. at 577). Such independent sources include state statutes and regulations, explicit contractual

guarantees, or even "agreements implied from 'the [defendants'] words and conduct in the light of the surrounding circumstances . . . .'" *Ibid.* (quoting *Perry v. Sindermann*, 408 U.S. 593, 602 (1972)); *see also Bishop v. Wood*, 426 U.S. 341, 344 (1976).

Thus, plaintiffs' due process claim "hinges on whether anything in Tennessee statute, common law, or regulation creates [a property] interest" in their continued employment as captains. *Lisle v. Metro. Gov't of Nashville*, 73 F. App'x 782, 785 (6th Cir. 2003). As a baseline, "Tennessee has long recognized the doctrine of employment at will, with the mutual right of either party to terminate such a relationship with or without cause." *Id.* at 786 (quoting *Brown v. City of Niota*, 214 F.3d 718, 720 (6th Cir. 2000)). Thus, plaintiffs' asserted property interest turns on the existence of some statute, regulation, or agreement that varies this background rule.

## A. *Section 67 of the Memphis City Charter*

First, plaintiffs argue that § 67 of the Charter, which entitles officers with 30 years' service to "the rank of captain[,]" "all the salary, emoluments and other privileges of said rank[,]" and "a pension as captain," creates a property interest in their continued employment as captains. While this is not a facially implausible reading of § 67, the Tennessee state courts have repeatedly held to the contrary. *See Dunlap v. City of Memphis*, No. W2003-02649-COA-R3-CV, 2004 Tenn. App. LEXIS 738, at *12 (Tenn. Ct. App. Nov. 12, 2004) ("[Section 67] is a guarantee that officers with thirty years of service can *retire* at the rank of Captain, with pension benefits of a Captain, but [it] provides no guarantee of employment beyond the automatic promotion." (emphasis in original)); *Posey v. City of Memphis*, 23 S.W.3d 332, 335 (Tenn. Ct. App. 2000) ("[T]he automatic promotion provision of Section 67 [is] purely a retirement tool. . . . [It guarantees] no automatic benefit if

employment is continued after thirty years."); *Burrell v. City of Memphis*, No. 29, 1989 Tenn. App. LEXIS 544, at *3 (Tenn. Ct. App. Aug. 16, 1989) ("[W]hile Section 67 of the Charter provide[s] for automatic promotion to captain [after] thirty years of service as well as a captain's pension upon retirement, the section [does] not require the City to continue employment of the plaintiffs for any length of time.").

While we are not bound by these cases, "[w]e will accept the holding of a state intermediate appellate court with respect to state law unless we determine the highest court of the state would decide otherwise." *United States v. Philp*, 460 F.3d 729, 732 (6th Cir. 2006). We see no reason to believe that the Tennessee Supreme Court would reject this twenty-year-old line of cases. Accordingly, we agree with the district court that the abolition of the captain rank did not derogate from any property interest guaranteed by § 67.[7]

**B.** *Section 246 of the Memphis City Charter*

Next, plaintiffs argue that the abolition of the captain rank violated a property interest secured by § 246 of the Charter, which provides that "[t]he City may terminate, suspend, or demote an employee for just cause . . . ." Plaintiffs are correct that "[s]tatutes providing that [public] employees cannot be discharged or demoted without cause . . . give the employee a protected property interest in continued employment" cognizable under the Due Process Clause. *Williams v. Comm. of*

---

[7] On the other hand, as interpreted by the Tennessee courts, § 67 clearly *does* give plaintiffs a protected property interest in their captain-level *pension benefits*. However, plaintiffs' pensions were not affected by the abolition of the captain rank.

- 10 -

No. 08-6046
*Aldridge, et al. v. City of Memphis, et al.*

*Kentucky*, 24 F.3d 1526, 1537-38 (6th Cir. 1994).  However, we agree with the district court that § 246 is simply inapplicable to terminations or demotions for other-than-disciplinary reasons.

Section 246 falls under Article 34 of the City Charter, which creates and empowers the City's Civil Service Commission ("Commission").  That § 246 is found under this Article implies that its "just cause" language must be interpreted in light of the purpose and jurisdiction of the Commission, which is "to review disciplinary actions . . . ."  Charter § 245; *see also City of Memphis v. Civil Serv. Comm'n*, 1985 Tenn. App. LEXIS 3244, at *5 (Tenn. Ct. App. Nov. 19, 1985) ("[T]he Commission does not have jurisdiction to review non-disciplinary employee terminations by the City.").  It would be illogical to conclude that the drafters of § 246 intended its "just cause" language to create a free-standing property interest that the Commission could not enforce.  Furthermore, immediately following the "just cause" language at issue, § 246 states that "[e]numeration of the above-stated *disciplinary* actions [i.e., termination, suspension, or demotion], which are reviewable by the [C]ommission, shall not be construed as a limitation on powers of the City to impose other less stringent *disciplinary* measures which shall not be appealable to the [C]ommission" (emphasis added).  This proviso strongly suggests that section's "just cause" language is inapplicable to non-disciplinary personnel actions.  We therefore hold that any property interest created by § 246 is not abridged by non-disciplinary personnel actions such as the one at issue here.

**C. *Implied Contract***

Finally, plaintiffs argue that the City's course of conduct – specifically, the Department's past practice of allowing all captains to retain that rank until they chose to retire, were promoted, or were terminated for cause – gave rise to a property interest in the form of an implied contract of continued

employment. While the Supreme Court has recognized that a property interest in continued

employment can be created by "agreements implied from the [employer's] words and conduct in the

light of the surrounding circumstances," *Perry*, 408 U.S. at 602 (internal quotation marks omitted),

it has emphasized that "the sufficiency of [such a] claim of entitlement must be decided by reference

to state [contract] law." *Bishop*, 426 U.S. at 344; *see also Perry*, 408 U.S. at 602 n.7 ("If it is the

law of Texas that a teacher in the respondent's position has no [implied contractual] claim to job

tenure, the respondent's claim would be defeated.").

Under Tennessee contract law, a contractual interest in continued employment will not be

inferred on behalf of an at-will employee from an employer's conduct absent a "show[ing] that the

agreement . . . was supported by adequate consideration [other than the employee's past services],

that there was a mutual assent to the terms of the agreement and that it was sufficiently definite to

be enforceable." *Price v. Mercury Supply Co., Inc.*, 682 S.W.2d 924, 933 (Tenn. Ct. App. 1984)

(holding that employer's statement that otherwise at-will employee "would never have to worry

about employment because of the service he had rendered to the company in the past" did not create

enforceable expectation of continued employment); *see also White v. Fort Sanders-Park West Med.

Ctr.*, No. E2006-00330-COA-R3-CV, 2007 WL 241024, at *3 (Tenn. Ct. App. Jan. 29, 2007). Here,

as the district court properly noted, "[p]laintiffs have offered no evidence of consideration for the

implied contract beyond their services, for which they were undisputedly paid." *Aldridge v. City of

Memphis*, No. 05-2966 B, 2007 WL 4570881, at *5 (W.D. Tenn. Dec. 27, 2007).

Furthermore, background circumstances establish that no mutual understanding of life tenure

could reasonably have existed here. Although neither party cites it, we take judicial notice that the

Memphis City Code contains a section providing that the "[s]ervices of any employee may be terminated when the necessity for his or her job or position no longer exists or when funding is no longer available . . . ."  City Code § 3-8-7 (2007) (formerly § 9-41(1985)).  Moreover, it is undisputed that, over twenty years ago, the City eliminated the tenured captain rank in its Fire Department, which was governed by the same charter provision, and outright terminated all but one of the officers holding that rank.  *See Burrell*, 1989 Tenn. App. LEXIS 544, at *4-*5.

Accordingly, no implied contract exists under Tennessee law, and thus, there is no property interest protected by the Due Process Clause.[8]

## II.  Race and Sex Discrimination

Plaintiffs assert that the decision to eliminate the captain rank constituted intentional disparate treatment on the basis of race and sex.[9]  Where, as here, no direct evidence of discrimination exists, disparate-treatment race- and sex-discrimination claims are analyzed using the

---

[8]  Before the trial court, plaintiffs asserted a state-law breach-of-implied-contract claim against the City in addition to their due-process claim based on implied contract.  Plaintiffs have not argued their independent contract claim on appeal; accordingly, it is waived.  *See United States v. Phinazee*, 515 F.3d 511, 520 (6th Cir. 2008).  Even if they had pursued their contract claim, however, it would fail for these same reasons.

[9]  Plaintiffs' claims under the Equal Protection Clause, 42 U.S.C. § 1981, Title VII, and the THRA are analyzed identically.  *See Miller v. City of Canton*, 319 F. App'x 411, 419 (6th Cir. 2009); *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 673 (6th Cir. 2008); *Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir. 1988).  We note that 42 U.S.C. § 1981 proscribes intentional racial discrimination in "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions *of the contractual relationship*."  42 U.S.C. § 1981(b) (emphasis added).  District courts in this circuit have held that at-will employees in Tennessee possess a "contract" for purposes of § 1981.  *See Henry v. Trammell Crow SE, Inc.*, 34 F. Supp. 2d 629, 635 (W.D. Tenn. 1998).  We assume arguendo that this is the case.

well-known *McDonnell Douglas* proof structure. *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 584 (6th Cir. 2009) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). We assume, without deciding, that plaintiffs are able to make out a prima facie case of race and sex discrimination under *McDonnell Douglas*.

Once a prima facie case of discrimination is established, the employer "must articulate a legitimate non-discriminatory reason" for the employment decision. *Upshaw*, 576 F.3d at 585. "This is merely a burden of production, not of persuasion, and it does not involve a credibility assessment." *Ibid.* The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing "admissible evidence of a legitimate, nondiscriminatory reason" for the elimination of the captain position. *Blair v. Henry Filters, Inc.,* 505 F.3d 517, 524 (6th Cir. 2007). Defendants submit that the captain rank was eliminated because it was "not operationally necessary" and "superfluous" – *i.e.*, captains were paid a major's salary while many performed the duties of employees as many as three ranks lower and who earned as much as $17,802.93 less per year. Appellees' Br. at 37-39. Thus, defendants have met their burden of production by establishing a nondiscriminatory reason for terminating the captain position, *Blair*, 505 F.3d at 524, and "the mandatory presumption of discrimination created by the prima facie test drops from the case." *Lindsay v. Yates*, 578 F.3d 407, 421 (6th Cir. 2009) (internal quotation marks omitted).

If the employer carries its burden, "the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." *Blair*, 505 F.3d at 524. "A plaintiff may establish that an employer's stated reason for its employment action was pretextual by showing that the reason (1) had no basis in fact, (2) did

not actually motivate the challenged conduct, or (3) is insufficient to explain the challenged conduct." *Upshaw*, 576 F.3d at 586. "The plaintiff must produce sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him." *Ibid.* (internal quotation marks omitted) (alteration in original); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) ("[R]ejection of the defendant's proferred reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination" but does not "*compel[]*" a finding of discrimination.).

To show that defendants' asserted rationale was a pretext for discrimination, plaintiffs first argue that there was "no study that concluded the captain rank caused any inefficiency in police operations" and "no report or study that showed how abolishing the rank . . . could produce any savings for the City." Appellants' Br. at 37-38, 43. However, there is no dispute that many (if not most) captains drew salaries out of proportion to the job duties that they actually performed. It does not take a formal study to draw a permissible conclusion that this was inefficient; "[t]he decisional process used by the employer [need not] be optimal [nor must it leave] no stone unturned." *Haughton v. Orchid Automation*, 206 F. App'x 524, 532 (6th Cir. 2006) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir.1998)) (second and third alterations in *Haughton*); *accord EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1198 (10th Cir. 2000) ("[T]he failure to conduct a formal study of the benefits realized by [an employment practice], standing alone, does not undermine Defendant's assertion that it had a good-faith belief the [practice] reduced . . . costs."). The absence of a formal cost-cutting study does not provide sufficient evidence from which a jury could infer that the defendants discriminated against the captains on the basis of race or sex.

Plaintiffs also allege that defendants' current justification of the abolition – that the rank was "operationally unnecessary" – is inconsistent with Godwin's initial statement upon announcing the abolition that the City was "in the midst of a serious financial situation" and that "[i]n order for the City to have funds to meet payroll and its obligations, spending [had to] be significantly reduced." We have held that "[a]n employer's changing rationale for making an adverse employment decision can be evidence of pretext" because "[s]hifting justifications over time calls the credibility of those justifications into question." *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002). However, "[t]he *extent* to which such shifting justifications are probative of pretext depends upon the circumstances of a given case" and the magnitude of the inconsistency. *Eades v. Brookdale Senior Living, Inc.*, No. 08-6549, 2010 WL 3927246, at *5 (6th Cir. Sept. 22, 2010) (unpublished opinion) (citing *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009)); Here, whether the asserted explanation is a "serious financial situation" *requiring* cost-cutting or a mere desire to eliminate financial inefficiency, the unnecessary expense of the captains' salaries has always been at issue. Thus, the City has consistently justified the changes on the grounds of efficiency.

Relatedly, plaintiffs point to evidence that Godwin's statement that the City was in danger of failing to meet payroll was false. As plaintiffs note, the City's CAO testified that there was actually no danger of failing to meet payroll, and Godwin himself testified that the Department would have had a budget surplus even if the rank had not been abolished. However, the CAO also testified that the City had "organizational financial challenges" at the time, that the City needed to reduce spending to increase its reserve fund, and that "during that time period . . . all [City] divisions were asked to reduce their budget . . . ." Thus, while the evidence certainly allows the inference that

Godwin, to save face, exaggerated the budgetary pressures that led him to make his decision, plaintiffs have not produced evidence from which a reasonable jury could conclude that illegal motivations more likely explained the elimination of the captain rank. *Blair*, 505 F.3d at 533 n.15. *See Gatch v. Milacron, Inc.*, 111 F. App'x 785, 791 (6th Cir. 2004) ("[E]ven if the [reduction in force] was not entirely necessary from a business standpoint, . . . [t]his evidence simply does not permit a finding that . . . discrimination rather than business judgment motivated [it] . . . ."); *see also Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 577-78 (7th Cir. 2003) ("Even accepting that [the employer] may have at times over-defended its decision, we believe that its overall account is substantially consistent with that of a company seeking to reduce costs . . . .").[10]

Accordingly, the district court's grant of summary judgment to defendants with respect to plaintiffs' race- and sex-discrimination claims was proper.

## III. Age Discrimination

Under the ADEA, it is unlawful for an employer

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age; [or]

---

[10] Plaintiffs insisted at oral argument that defendants' cost-saving explanation cannot be believed because the Department conducted a round of merit-based promotions to lieutenant and major shortly after the captain rank was abolished. However, it is undisputed that there was a serious pre-existing shortage of lieutenants and majors before the abolition. While the Department's decision to make these promotions may be further evidence that the Department was not on the brink of insolvency, its choice to incur operationally necessary expenses does not imply that the abolition of the captain rank was not motivated by cost-saving considerations. Plaintiffs' argument is akin to suggesting that an individual's choice to forego dessert with his meal could not have been motivated by weight-loss considerations because he ate *something* rather than fasting completely.

> (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age . . . .

29 U.S.C. § 623(a). The first clause above has been interpreted as proscribing intentional disparate treatment on the basis of age, *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609 (1993), while the second clause has been interpreted as proscribing facially neutral employment practices with a disparate impact based on age, *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 240 (2005). Plaintiffs allege both forms of age discrimination.[11]

## A. *Disparate Treatment*

A plaintiff may establish disparate treatment in violation of the ADEA by either direct or circumstantial evidence. *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (2009). Plaintiffs argue that the district court erred by finding a lack of direct evidence of age discrimination. Specifically, plaintiffs argue, defendants admitted that "every employee holding the Captain rank had to be over age 40" by virtue of the 30-year service requirement. Appellants' Br. at 51. This, however, is not direct evidence of intent to discriminate based on age.

"Direct evidence of discrimination is that evidence which, if believed, *requires* the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Ibid.* (emphasis added); *see also Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (stating that "a facially discriminatory employment policy or a corporate decision maker's express

---

[11] "We apply the same analysis to [plaintiffs'] discrimination claims brought under the THRA as to [their] claims brought under . . . the ADEA." *Jones v. Memphis Light, Gas and Water Div.*, No. 08-6212, 2009 WL 2974888, at *4 (6th Cir. Sept. 17, 2009).

statement of a desire to remove employees in the protected group is direct evidence of discriminatory intent."). The Supreme Court has made clear that "there is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age" and that such factors include "an employee's pension status or seniority, that is empirically correlated with age." *Hazen Paper*, 507 U.S. at 608-09; *see also Kentucky Ret. Sys. v. EEOC*, 128 S. Ct. 2361, 3270 (2008). Captain status is an age-correlated factor. Plaintiffs' asserted "direct evidence" does not "*require*[] the conclusion" that age, rather than captain status itself, motivated the decision to abolish the rank.

Plaintiffs' disparate-treatment age-discrimination claim must therefore be proved, if at all, using the *McDonnell Douglas* proof structure. *Geiger*, 579 F.3d at 622.[12] However, as discussed above, even assuming for the sake of argument that plaintiffs can make out a prima facie case under *McDonnell Douglas*, defendants have asserted a legitimate non-discriminatory reason, and plaintiffs have not adduced sufficient evidence of pretext. Accordingly, plaintiffs' disparate-treatment age-discrimination claim was properly dismissed.

**B.  *Disparate Impact***

---

[12] As we noted in *Geiger*, the Supreme Court in *Gross v. FBL Financial Services, Inc.,* 129 S.Ct. 2343 (2009), rejected an evidentiary framework that shifts the burden of persuasion to the defendant-employer in ADEA disparate treatment claims, which this circuit had applied to claims based on direct evidence. *Geiger*, 579 F.3d at 621. However, the *Gross* Court expressly declined to decide whether the separate *McDonnell Douglas* burden-shifting framework applies to the ADEA. *Geiger*, 579 F.3d at 622. Because this circuit has "long found the *McDonnell Douglas* framework useful in analyzing circumstantial evidence of ADEA claims," and because *Gross* did not clearly proscribe this practice, we apply it here. *Ibid*.

"[W]hen bringing a disparate impact claim [under the ADEA], plaintiffs need not show that a defendant intended to discriminate, but must instead prove that a particular employment practice, although neutral on its face, has produced a significant adverse effect on [older workers] . . . ." *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 830 (6th Cir. 2000). "The plaintiff must first establish a prima facie case by identifying and challenging a specific [facially neutral] employment practice, and then show an adverse effect by offering statistical evidence of a kind or degree sufficient to show that the practice in question has caused the adverse effect in question." *Ibid.* (internal quotation marks omitted). The ADEA's disparate-impact coverage is "significantly narrow[er]" than Title VII's, as the ADEA "provides that it shall not be unlawful for an employer 'to take any action [with a disparate impact on older workers] . . . where the differentiation is based on reasonable factors other than age [("RFOA")] . . . .'" *Smith*, 544 U.S. at 238. "[O]nce a plaintiff has satisfied [the prima facie burden], the burden of persuasion shifts to the employer to show that the practice is supported by a RFOA." *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 404 (6th Cir. 2008).

Once again, we assume for the sake of argument that plaintiffs can establish a prima facie case of disparate impact under the ADEA – *i.e.*, that the elimination of the captain rank is a facially neutral employment practice with a disparate impact based on age.[13]  Even so, plaintiffs' disparate-

---

[13] Defendants argue that plaintiffs have not identified a valid "employment practice" because the abolition of the captain rank targeted only a specific subgroup of employees instead of being "applied across the workforce . . . ." Appellants' Br. at 50-51. The district court agreed, although it cited in support only one out-of-circuit case, *EEOC v. Allstate Insurance Co.*, 528 F.3d 1042 (8th Cir. 2008), which was vacated upon the grant of rehearing en banc. The EEOC has filed an amicus brief arguing that the district court's interpretation of *Allstate* is incorrect. Because resolution of this question is not necessary to the disposition of this case, we take no position on it.

impact age-discrimination claim cannot prevail because defendants have met their burden of demonstrating that the practice is supported by an RFOA. *Allen*, 545 F.3d at 404. The RFOA inquiry is one of reasonableness. *See Smith*, 544 U.S. at 243 ("Unlike the business necessity test [under Title VII's disparate-impact branch], which asks whether there are other ways for the employer to achieve its goals that do not result in a disparate impact on a protected class, the reasonableness inquiry [under the ADEA] includes no such requirement"). As the district court found, there is no genuine issue of material fact as to the reasonableness of the factors other than age offered by the defendants to explain the disparate impact.

Here, once again, defendants have adduced evidence showing that the employment action was based on the inefficiency of paying the captains more (in some cases, tens of thousands of dollars more) than patrol officers, sergeants, or lieutenants to perform the very same duties those lower-ranked officers performed. We recently held that the "terminat[ion of] employees based on seniority to facilitate the hiring of new, less costly employees" qualified as an RFOA. *Allen*, 545 F.3d at 405. That being the case, demoting employees of a particular seniority status for cost-saving and operational considerations surely qualifies as well. Whether there were more logical or less disruptive ways for the Department to increase its operating efficiency is beside the point. *Smith*, 544 U.S. at 243.

## IV. Residual Equal-Protection Claim

In addition to asserting more traditional equal-protection claims based on their membership in protected classes, which we have already addressed, plaintiffs argue that the abolition of the captain rank fails even rational-basis review under the Equal Protection Clause because defendants'

decision to single out the captains for demotion was "wholly arbitrary and irrational," Am. Compl. ¶ 65, and/or "motivated by animus and ill-will," Appellants' Br. at 63.

The Supreme Court has recognized that plaintiffs may assert a claim under the Equal Protection Clause even if they do not claim membership in any class or group, "where [they] allege[] that [they have] been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *see also Engquist v. Oregon Dep't of Ag.*, 128 S. Ct. 2146, 2149 (2008) (plaintiff "alleg[ed] that she was fired not because she was a member of an identified class (unlike her race, sex, and national origin claims), but simply for 'arbitrary, vindictive, and malicious reasons'"). While such equal-protection claims are generally termed "class-of-one" claims, *see Olech*, 528 U.S. at 564; *Engquist*, 128 S. Ct. at 2149, this term is something of a misnomer; the hallmark of such a claim is not the allegation that *one individual* was singled out, but rather, the allegation of arbitrary or malicious treatment not based on membership in a disfavored class. *See Olech*, 528 U.S. at 564 n. (noting, despite the Court's characterization of the plaintiff's claim as a "class-of-one" claim, that "the complaint in this case could be read to allege a class of five"); *Franks v. Rubitschun*, 312 F. App'x 764, 766 n.2 (6th Cir. 2009) ("Although such claims are typically referred to as class-of-one claims, there is no requirement that the challenged government action single out one solitary person.").

There is reason, however, to question whether plaintiffs may assert their residual equal protection claim at all in light of *Engquist v. Oregon Department of Agriculture*, in which the Court held that "the class-of-one theory of equal protection does not apply in the public employment

context." 553 U.S. at 598. We need not decide the limits of *Enguist* here, however, because plaintiffs' residual equal-protection claim suffers from other fatal deficiencies.

First, "[t]o satisfy [the Equal Protection Clause's] threshold inquiry, [plaintiffs] must allege that [they] and other individuals who were treated differently were similarly situated in all material respects." *Taylor Acquisitions, L.L.C. v. City of Taylor*, 313 F. App'x 826, 836 (6th Cir. 2009). Plaintiffs attempt to cast in this comparative role the captains in former years who were never demoted; however, prior generations of captains were not subject to Godwin's supervision, and there is no evidence that the Department faced similar logistical and budgetary concerns in the past. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) ("[T]he individuals with whom the plaintiff[s] seek[] to compare [their] treatment must have dealt with the same supervisor[ and] have been subject to the same standards . . . ."). Plaintiffs also suggest that they were similarly situated to probationary police officers, who, like captains, receive salary increases for completing a specified length of service; however, probationary officers are entry-level, non-civil-service employees who are not similar to captains in any other respect.

Furthermore, even if plaintiffs could pass the "similarly situated" hurdle, "governmental action subject to equal protection scrutiny under the rational basis test must be sustained if *any* conceivable basis rationally supports it." *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton County*, 430 F.3d 783 (6th Cir. 2005) (citing *Fed. Commc'ns Comm'n v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313-14 (1993)) (emphasis in original). Under rational-basis review, a defendant has "no obligation to produce evidence to sustain the rationality of its action; its choice is presumptively valid and 'may be based on rational speculation unsupported by evidence or empirical data.'" *Ibid.* (quoting *Beach*

No. 08-6046
*Aldridge, et al. v. City of Memphis, et al.*

*Commc'ns*, 508 U.S. at 315)). As discussed above in the race-, sex- and age-discrimination contexts, defendants have presented a legitimate nondiscriminatory reason for their action.[14]

## V.  Tortious Interference Against Godwin

Lastly, plaintiffs allege that Godwin, in his individual capacity, "intended to [and did] cause the breach of the contract and/or business relationship between the City of Memphis . . . and plaintiffs" in violation of Tennessee law. Am. Compl. ¶ 80. Tennessee recognizes a cause of action for tortious interference with another person's at-will employment. *Forrester v. Stockstill*, 869 S.W.2d 328, 330 (Tenn. 1994). However, "a party to a contract cannot be liable for tortious interference with that contract." *Cambio Health Solutions, LLC v. Reardon*, 213 S.W.3d 785, 789 (Tenn. 2006). And, as the Tennessee Supreme Court has held,

> when an . . . employee of a corporation acts within the general range of his authority, and his actions are substantially motivated by an intent to further the interest of the corporation, in claims of intentional interference with employment, the action of the . . . employee is considered to be the action of the corporation and is entitled to the same immunity from liability.

---

[14] Plaintiffs argue that the existence of a conceivable legitimate reason is beside the point because the abolition of the captain rank was actually "motivated by animus." Appellants' Br. at 63. However, as the district court observed, while disfavored treatment based on animus *alone* cannot pass rational-basis review, *see Romer v. Evans*, 517 U.S. 620, 632 (1996) (striking down state action where it "seem[ed] inexplicable by anything but animus toward the class it affects"); *Stemler v. City of Florence*, 126 F.3d 856, 873-74 (6th Cir. 1997) (stating that "action based on . . . animus alone violates the Equal Protection Clause"), the absence of rational basis can be shown by "negativing every conceivable basis which might support the government action or by demonstrating that the challenged government action was motivated by animus or ill-will." *Warren v. City of Athens*, 411 F.3d 697, 711 (6th Cir. 2005) (internal quotation marks and brackets omitted). This is far from such a case. Furthermore, upon closer examination, Godwin's so-called "animus" against captains boils down to indelicately articulated dissatisfaction with the tenure-based promotional system and the value provided by holders of the captain rank. While his alleged comments were crude, they support, rather than undermine, defendants' asserted explanation for the elimination of the rank.

No. 08-6046
*Aldridge, et al. v. City of Memphis, et al.*

*Forrester*, 869 S.W.2d at 334-35. In this case, as in *Forrester*, despite the evidence of Godwin's rude remarks toward captains,

> There is no evidence in the record that [Godwin] had any relationship with [plaintiffs] except through their connection with [the Department]. There is no evidence that [Godwin] harbored any malice, ill will, or other attitude or emotion towards [plaintiffs] *except within the context of [the Department]*. There is no evidence that [Godwin] would benefit personally from [plaintiffs' demotion]. Most importantly, there is no evidence that [Godwin was] acting for any purpose other than [his] perceived best interest for [the Department].

*Id.* at 334 (emphasis added). Accordingly, Godwin is immune from personal liability for inducing plaintiffs' demotions, and the district court correctly so held.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.